# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ROOPALI YADAV, Ph.D.,
3336 Spring Lane, Apt. A20,
Falls Church, Virginia 22041

*Plaintiff*,

v.

UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES,
20 Massachusetts Avenue, N.W.
Washington, DC  20528

and

KENNETH T. (KEN) CUCCINELLI, Acting
Director, U.S. Citizenship and Immigration
Services, in his Official Capacity,
20 Massachusetts Avenue, N.W.
Washington, DC  20528,

*Defendants*.

**CIVIL ACTION NO.:**

**COMPLAINT FOR DECLARATORY
RELIEF AND REVIEW OF AGENCY
ACTION UNDER THE
ADMINISTRATIVE PROCEDURE ACT**

## I.    NATURE OF THE ACTION

1.    This case arises under the Immigration and Nationality Act ("INA"), 8 U.S.C.

§ 1101 *et seq*., and seeks this Court's review of agency action under the Administrative Procedure

Act ("APA"), 5 U.S.C. § 701 *et seq*.  Plaintiff, Roopali Yadav, Ph.D. ("Plaintiff" or "Dr. Yadav"),

a research scientist employed by Georgetown University, seeks judicial review of final agency

action of Defendants, U.S. Citizenship and Immigration Services ("Defendant" or "USCIS"), and

its current Acting Director, Kenneth T. (Ken) Cuccinelli (collectively, "Defendants"), taken on

August 8, 2018, denying her immigrant visa petition, Form I-140, Immigration Petition for Alien

Worker, filed on May 31, 2017 pursuant to 8 U.S.C. § 1153(b)(1)(A) (the "denial").  Her I-140

petition asked that she be classified as an individual of "extraordinary ability" in science who seeks

to enter the United States to continue work in her area of extraordinary ability, and whose entry into the United States will substantially benefit prospectively the United States ("EB-1A petition").

2.      Dr. Yadav also challenges in this action Defendants' denial on May 7, 2019 of her application on Defendants' Form I-485, Application to Register Permanent Residence or Adjust Status,  which sought to adjust her nonimmigrant status from H-1B (worker in a specialty occupation) to the status of a U.S. lawful permanent resident ("LPR"), *i.e.*, a green card holder, a denial which was made solely on the basis of their denial of her EB-1A petition, and involved no exercise of agency discretion, as contemplated under the enabling legislation, 8 U.S.C. § 1255.

## II.      **PARTIES**

3.      Plaintiff is a resident of the Falls Church, Virginia and a citizen of India.  She is lawfully employed as a Medical Scientist in H-1B (Specialty Occupation) nonimmigrant visa status by Georgetown University.  She holds a Doctor of Philosophy (Ph.D.) degree in Pharmacology, conferred in 2012, by Creighton University.  She also holds a Master's Degree in Veterinary Science (with an emphasis in Veterinary Obstetrics and Gynecology), conferred in 2005 by Mathura Veterinary University of Mathura, India, and a Doctor of Veterinary Medicine license, conferred in 2002, by G. B. Pant University, Pantnagar, India.

4.      Plaintiff's scientific research studies have focused on the molecular characterization of a specific gene, the glutamate delta one receptor ("GluD1"), and its role in brain disease and functioning in human and nonhuman subjects.  Her research findings have been cited more than 200 times since 2014 for having established critical knowledge about the important regulatory role that the GluD1 gene plays in brain circuitry and the functioning of the brain, as well as in the causes and treatment of such debilitating and often fatal illnesses as Alzheimer's disease and Parkinson's disease. Her GluD1 research findings also offer novel insights into the potential eradication of such mosquito-borne diseases as malaria and the Zika virus.

59030006v.2

5.      Defendant USCIS is a subordinate component of the Department of Homeland Security ("DHS"), and an "agency" within the meaning of the APA, 5 U.S.C. § 551(1).  DHS assumed responsibility from the former Immigration and Naturalization Service ("INS") on March 1, 2003, to perform adjudicative responsibilities under the INA.  The Secretary of  DHS has delegated the department's authority to DHS's component agency, USCIS.  *See* DHS Delegation Number 0150.1, II. §§ W and BB (June 5, 2003) (conferring authority under the immigration laws, including but not limited to § 204 of the INA [8 U.S.C. § 1154], to accept and adjudicate immigrant visa petitions and other requests for immigration benefits) accessible at https://www.hsdl.org/?view&did=234775 (last visited Sept. 5, 2019).

6.      Defendant Kenneth T. (Ken) Cuccinelli is sued in his official capacity as Acting Director of Defendant USCIS.

### III.      JURISDICTION AND WAIVER OF SOVEREIGN IMMUNITY

7.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as a civil action arising under the laws of the United States. This Court has jurisdiction to enter declaratory judgments under 28 U.S.C. § 1361, to invalidate unlawful agency actions under 5 U.S.C. § 706, and to review agency action arising under the INA, 8 U.S.C. § 1101 et. seq.

8.      The United States has waived sovereign immunity under 5 U.S.C. § 702.

### IV.      STANDING

9.      Plaintiff, as the self-petitioner of her EB-1A petition, has a legally protected interest under the INA in receiving a lawful decision from Defendants on her petition, *i.e.*, a decision which is neither arbitrary nor capricious, nor an abuse of discretion, and which is evidence-based and otherwise in accordance with law, as provided in 5 U.S.C. § 706(2). *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), and *Matter of Kurys*, 11 I&N Dec. 315 (BIA 1965) (appeal from denial of a visa petition may only be filed by the petitioner); *compare*

*Matter of V-S-G- Inc.*, USCIS Adopted Decision 2017-06 (AAO Nov. 11 2017).  Plaintiff's legal interest has been infringed inasmuch as the unlawful denial of this petition has caused Plaintiff to be deprived of the opportunity for which she would otherwise be eligible under law to receive an adjustment of her status from H-1B nonimmigrant visa status to the status of a U.S LPR pursuant to 8 U.S.C. § 1255.

10.     Defendants' infringement of  Plaintiff's right to a lawful decision on her EB-1A petition has also caused her concrete and particularized injury in that as a result of this infringement she is subject to a maximum aggregate period of authorized stay in the United States under her H-1B visa status of no more than six years at which time she must depart the United States. With approximately only three-and-a-half years remaining on this six-year maximum, Defendants' denial of her EB-1A petition will foreseeably interrupt the critically important scientific research that she is performing, and the additional research which she had outlined in detail in the business plan included with her EB-1A petition, involving research into the molecular characterization of the GluD1 receptor and its role in brain functioning and disease. Her business plan disclosed in detail her intention to enter the United States to continue work in her area of extraordinary ability, and demonstrated that her entry into the United States as a lawful permanent resident will substantially benefit the United States prospectively.

11.     Furthermore, by reason of Defendants' denial of her EB-1A petition, Plaintiff's legal rights are infringed because she is precluded from obtaining extensions of her H-1B status beyond an aggregate period of six years under Section 106(a) of the American Competitiveness in the 21st Century Act of 2000, Pub. L. 106-313, 8 U.S.C. 1184(g)(4), which requires an approved or pending immigrant visa petition.

12.     There is a causal connection between the injuries-in-fact that Plaintiff has suffered and will continue to suffer and the Defendants' challenged behavior in that it is precisely the Defendants' denial of her EB-1A petition which prevents her from engaging in scientific research on a prolonged and uninterrupted basis, and from receiving critical grant funding for which she would otherwise be eligible if and when she is granted LPR status.  Furthermore, the injuries-in-fact she has suffered could well be redressed by a favorable ruling in that such a ruling would enable her to be accorded LPR status, and thereby support herself and lawfully remain in the United States without the legal obligation to depart the country and interrupt her research prematurely.

## V.     VENUE

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because Defendants are located in the District of Columbia.

## VI.     FINAL AGENCY ACTION

14.     Defendants' denial of Dr. Yadav's EB-1A petition constitutes final agency action under the APA and empowers this Court to review Defendants' decision.  There is no exhaustion requirement for her claim.  APA claims are not subject to exhaustion requirements unless specifically required by statute or regulation. *See Darby v. Cisneros*, 509 U.S. 137, 154 (1993) ("[W]here the APA applies, an appeal to 'superior agency authority' is a prerequisite to judicial review *only* when expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review.") (emphasis in original)); *CSX Transp., Inc. v. Surface Transp. Bd*., 584 F.3d 1076, 1078 (D.C. Cir. 2009) ("[A]bsent a statutory or regulatory requirement, courts have no authority to require parties to exhaust administrative procedures before seeking judicial review.").  Nothing in the INA or agency regulations requires that Dr. Yadav pursue an administrative appeal of a denied visa petition before

requesting judicial review. *Accord Relx, Inc. v. Baran*, Case No. 19-cv-1993, 2019 U.S. Dist. LEXIS 130286 (D. D. C., Aug. 5, 2019).

## VII. PROCEDURAL AND LEGAL BACKGROUND

15.     Plaintiff's EB-1A petition requested an immigrant visa classification for which she is eligible under the Immigration Act of 1990, Pub. L. 101-649, 104 STAT. 4978. [S. 358] ("IMMACT").  IMMACT introduced 8 U.S.C. § 1153(b)(1) which generally established the "First Preference" category for "priority workers" and, specifically, Subparagraph (A) thereof, reserved for "aliens with extraordinary ability" ("EB-1A visa category").  Plaintiff filed her EB-1A petition requesting that Defendants comply with their duly promulgated post-IMMACT regulations, codified at 8 CFR § 204.5(h)(3)(i)-(x), which prescribe ten categories of evidence which can be submitted by or on behalf of a noncitizen requesting approval of an EB-1A petition in order to satisfy the "extraordinary ability" standard.   These regulations remain in effect.

16.     In their August 8, 2018 decision denying Plaintiff's EB-1A petition, Defendants determined that Dr. Yadav had submitted satisfactory proof under two but not at least three of the ten categories of evidence demonstrating extraordinary ability prescribed in Defendants' regulations.  They found by a preponderance of the evidence that she had submitted persuasive proof of her participation as a judge of the work of others in the same or an allied field of specialization as her own field of scientific research, and evidence that she had authored scholarly articles in her field, in professional or major trade publications or other major media.

17.     Given Defendants' decision that Dr. Yadav had not submitted sufficient evidence that she satisfied at least one more category of the ten stated in the cited regulations, Defendants declined to conduct what it claimed – without citation to legal authority – was required for approval of her EB-1A petition, namely, a "final merits determination."  According to Defendants, the final merits determination is necessary in order for Defendant USCIS to confirm that Dr. Yadav has

reached a level of expertise indicating that she is an individual of extraordinary ability in her specialized field of research science.

18.     Plaintiff maintains that by a preponderance of the evidence in the administrative record of proceedings she indeed satisfied at least three of the ten regulatory categories of evidence to establish her extraordinary ability in her field of research science, and that she is not required to satisfy, nor are Defendants allowed to require satisfaction of, a claimed requirement of a "final merits determination." Nor is she required to satisfy a standard of proof which the Defendants have apparently imposed, namely, that of proof beyond a reasonable doubt or to a moral certainty.

19.     Plaintiff further maintains that the purported requirement of a "final merits determination," as applied to her, is a legislative rule not found in Defendants' extant regulations under the EB-1A visa category; that on a June 6, 1995 Defendant USCIS's predecessor immigration agency, the former Immigration and Naturalization Service ("INS"), published a proposed (but never finalized) regulation ("the June 6, 1995 proposed rule") which in effect would have established authorization for a "final merits determination;" and that on December 22, 2010 Defendant USCIS issued a policy memorandum, PM-602-0005.1, "Evaluation of Evidence Submitted with Certain Form I-140 Petitions; Revisions to the Adjudicator's Field Manual (AFM) Chapter 22.2, AFM Update AD11-14" ("PM-602-0005.1"),  which likewise claimed authority to impose a final-merits-determination requirement in addition to the express requirement of the regulation at 8 CFR § 204.5(h)(3)(i)-(x) (requiring at least three-of-ten regulatorily prescribed categories of evidence to establish extraordinary ability). A final merits determination, in the view of Defendants as enunciated in PM-602-0005.1, thus shifts "the analysis of overall extraordinary ability to the end of the adjudicative process when a determination on the entire petition is made."

59030006v.2

20.     This Court is called upon to determine whether Defendants actions as applied to Plaintiff violated the APA by (A) ruling that Dr. Yadav had not satisfied at least one additional category of acceptable "extraordinary-ability" evidence set out at 8 CFR § 204.5(h)(3)(i)-(x), and (B) having created an ultra vires legislative rule in their adoption and implementation of a purported requirement of a final merits determination in order to approve EB-1A petition, as informally proclaimed, without lawful APA compliance, in the June 6, 1995 proposed rule and PM-602-0005.1.

21.     IMMACT amended the INA by enacting comprehensive changes to U.S. immigration law and procedure.  With respect to employment-based immigration, as explained in IMMACT's legislative history, Congress identified a variety of flaws in the extant legal immigration system that urgently needed correction:

> The U.S. labor market is now faced with two problems that immigration policy can help to correct. . . .[One] is the need of American business for highly skilled, specially trained personnel to fill increasingly sophisticated jobs for which domestic personnel cannot be found and the need for other workers to meet specific labor shortages. . . . Because it is unlikely that enough U.S. workers will be trained quickly enough to meet legitimate employment needs, and because such needs are already not being met, the Committee is convinced that immigration can and should be incorporated into an overall strategy that promotes the creation of the type of workforce needed in an increasingly competitive global economy without adversely impacting on the wages and working conditions of American workers.

> *See* H.R. REP. 101-723(I), H.R. REP. 101-723, H.R. Rep. No. 723(I), 101ST Cong., 2ND Sess. 1990, 1990 U.S.C.C.A.N. 6710, 1990 WL 200418, p. 6721.

22.     Lawmakers enacting IMMACT also identified other concerns:

> H.R. 4300, as amended, reflects the Committee's belief that both the preference [immigrant visa quota] system and the immediate relative program are in need of reform.  **With regard to the preference system**, **the Committee is convinced that the number of employment-based immigrants must be substantially increased, that the procedures governing their admission must be streamlined**, that both temporary and permanent programs are needed to promote diversity of nationalities within the immigrant streams, that backlogs within the current family related preferences need to be reduced, and that the ceiling on the number of immediate relatives of lawful permanent resident aliens should be significantly raised.

*Id.* at pp. 6715-6716 (emphasis added).

23.     Thus, by enacting IMMACT, Congress introduced 8 U.S.C. § 1153(b)(1) which created the "First Preference" category for "priority workers."   Subparagraph (A) of 8 U.S.C. § 1153(b)(1)(A) is reserved for "aliens with extraordinary ability".   It provides:

An alien is described in this subparagraph if--

(i) the alien has extraordinary ability in the sciences, arts, education, business, or athletics which has been demonstrated by sustained national or international acclaim and whose achievements have been recognized in the field through extensive documentation,

(ii) the alien seeks to enter the United States to continue work in the area of extraordinary ability, and

(iii) the alien's entry into the United States will substantially benefit prospectively the United States.

24.     Unlike all but one other employment-based immigrant visa category introduced by IMMACT, the EB-1A visa category does not require that a U.S. employer submit a petition to Defendant USCIS on behalf of a sponsored noncitizen or offer the individual a job (the other immigrant visa category exempt from the employer petition and job offer requirements is the so-called national interest waiver).   Rather, because subparagraph (A) of 8 U.S.C. § 1153(b)(1)(A), as amended by IMMACT, includes no requirement that an employer submit a job offer to an individual of extraordinary ability, this provision permits a noncitizen, such as Dr. Yadav, to self-petition for classification under the EB-1A visa category, as she has done.   *See* 8 CFR § 204.5(h)(5) ("No offer of employment required.   Neither an offer for employment in the United States nor a labor certification is required for this classification; however, the petition must be accompanied by clear evidence that the alien is coming to the United States to continue work in the area of expertise.").   In lieu of a job offer, Dr. Yadav submitted an extensive business plan outlining in detail several ways she would pursue her scientific research upon attaining lawful permanent

resident status.  Her business plan, on which Defendants offered no comment, thus satisfied the

remaining statutory requirements, namely, that she seeks to enter the United States to continue

work in her area of extraordinary ability, and that her entry to pursue this work will substantially

benefit prospectively the United States.

25.    In IMMACT's legislative history, Congress explained its rationale for creating the

EB-1A visa category:

> A.  Employment-Based Immigration
>
> The substantial increase provided for in the bill in the number of visas for permanent employment will help meet current demands and reduce the backlogs which have hampered employers' ability to conduct business. . . . The majority of permanent immigrants will require employer attestation as to recruitment of U.S. workers, wages, and working conditions, **but the bill exempts certain categories where in the past there has not been a demonstrated and significant labor impact**.
>
> . . .
>
> (a)  **Extraordinary ability**.-In order to qualify for admission in this category an alien must (1) demonstrate sustained national or international acclaim in the sciences, arts, education, business or athletics (as shown through extensive documentation); (2) be coming to the United States to continue work in that area of expertise; and (3) by virtue of such work benefit the United States.  **Documentation may include publications in respected journals**, media accounts of the alien's contributions to his profession, **and statements of recognition of exceptional expertise by qualified organizations**.  Recognition can be through a one-time achievement such as receipt of the Nobel Prize.  **An alien can also qualify on the basis of a career of acclaimed work in the field**.. . . In short, admission under this category is to be reserved for that small percentage of individuals who have risen to the very top of their field of endeavor.
>
> *See* H.R. REP. 101-723(I), H.R. REP. 101-723, H.R. Rep. No. 723(I), 101ST Cong., 2ND Sess. 1990, 1990 U.S.C.C.A.N. 6710, 1990 WL 200418, p. 6739. (emphasis added.)

26.    Following the enactment of IMMACT, the legacy immigration agency, INS,

published a proposed rule at 56 Fed. Reg.  30703 et seq. (July 5, 1991) (proposed rule), and final

regulations at 58 Fed. Reg. 60906 *et seq*. (Nov. 29, 1991) (final rule) which, *inter alia*, outlined

eligibility criteria and procedures for the acceptance and adjudication of petitions seeking immigrant visa classification under the EB-1A visa category.

27.     Consistent with the requirement reflected in IMMACT's legislative history that a noncitizen of extraordinary ability establish eligibility for the EB-1A visa category through "streamlined" "procedures" involving submission of "extensive documentation," INS established in its regulations eligibility criteria and a process for the review of evidence.

28.     Accordingly, the INS regulations at 8 CFR § 204.5(h)(3)(i)-(x), which Defendant USCIS has adopted and administers, provided at inception and still provide:

> Initial evidence A petition for an alien of extraordinary ability must be accompanied by evidence that the alien has sustained national or international acclaim and that his or her achievements have been recognized in the field of expertise.  Such evidence shall include evidence of a one-time achievement (that is, a major, internationally recognized award), or **at least three of the following** (emphasis added):
>
> > (i) Documentation of the alien's receipt of lesser nationally or internationally recognized prizes or awards for excellence in the field of endeavor;
> >
> > (ii) Documentation of the alien's membership in associations in the field for which classification is sought, which require outstanding achievements of their members, as judged by recognized national or international experts in their disciplines or fields;
> >
> > (iii) Published material about the alien in professional or major trade publications or other major media, relating to the alien's work in the field for which classification is sought.  Such evidence shall include the title, date, and author of the material, and any necessary translation;
> >
> > (iv) Evidence of the alien's participation, either individually or on a panel, as a judge of the work of others in the same or an allied field of specialization for which classification is sought;
> >
> > (v) Evidence of the alien's original scientific, scholarly, artistic, athletic, or business-related contributions of major significance in the field;
> >
> > (vi) Evidence of the alien's authorship of scholarly articles in the field, in professional or major trade publications or other major media;
> >
> > (vii) Evidence of the display of the alien's work in the field at artistic exhibitions or showcases;

(viii) Evidence that the alien has performed in a leading or critical role for organizations or establishments that have a distinguished reputation;

(ix) Evidence that the alien has commanded a high salary or other significantly high remuneration for services, in relation to others in the field; or

(x) Evidence of commercial successes in the performing arts, as shown by box office receipts or record, cassette, compact disk, or video sales.

29.     Moreover, INS regulations at 8 CFR § 204.5(h)(4), which Defendant USCIS has adopted and administers, provided at inception and still provide:

If the above standards do not readily apply to the beneficiary's occupation, the petitioner may submit comparable evidence to establish the beneficiary's eligibility.

30.     Consistently with IMMACT's legislative history, quoted above, Defendants' regulations at 8 CFR § 204.5(h)(2) define extraordinary ability to mean "a level of expertise indicating that the individual is one of that small percentage who have risen to the very top of the field of endeavor."  For unknown reasons, however, the regulations do not include the preceding sentence from the same Congressional source ("[a]n alien can also qualify on the basis of a career of acclaimed work in the field"), although unquestionably a career-focused recognition of "exceptional expertise" is what IMMACT's drafters intended.

31.     On July 30, 1992, INS Headquarters (Adjudications) issued a memorandum prepared by Lawrence Weinig, Acting Associate Commissioner for Examinations, to guide subordinate officers in the interpretation of the recently-promulgated IMMACT regulations, 8 CFR § 204.5(h)(3), and its application to evidence submitted by petitioners requesting classification for individuals of extraordinary ability.   In his memorandum (the "Weinig Memorandum"), Mr. Weinig stated on behalf of INS Headquarters (in relevant part):

The evidentiary lists [at 8 CFR § 204.5(h)(3)(i)-(x)] were designed to provide for **easier compliance by the petitioner and easier adjudication by the [INS] examiner**.  The documentation presented must establish that the alien is . . . an alien of extraordinary ability . . . .  **If this is established by the meeting three of the criteria for extraordinary aliens . . . , this is sufficient to establish the caliber**

of the alien.  **There is no need for further documentation on the question of the caliber of the alien.**  However, please note that the examiner must evaluate the evidence presented.  This is not simply a case of counting pieces of paper. . . .

Generally, we maintain that a book by the alien published by a "vanity" press, a footnoted reference to the alien's work without evaluation, an unevaluated listing in a subject matter index, *or* a negative or neutral review of the alien's work would be of little or no value.  On the other hand, **peer-reviewed presentations at academic symposia or peer-reviewed articles in scholarly journals, testimony from other scholars on how the alien has contributed to the academic field, entries particularly a goodly number) in a citation index which cite the alien's work as authoritative in the field, or participation by the alien as a reviewer for a peer-reviewed scholarly journal would more than likely be solid pieces of evidence.**  We are also inclined to believe that thesis direction (particularly at a Ph.D. thesis) would demonstrate an alien's outstanding ability as a judge of the work at others.  (Emphasis added.)

32.     The evidence described and excerpted below demonstrates unequivocally that through her research she has made original scientific contributions of major significance in the field, and that she has performed in a leading or critical role for organizations or establishments that have a distinguished reputation.  This evidence thus establishes that it fulfills two additional categories of eligibility for classification as a research scientist of extraordinary ability.

33.     The June 6, 1995 proposed rule, at  60 Fed. Reg.  29771 (June 6, 1995), which would have added requirements above and beyond the submission of at least three types of qualitatively-acceptable evidence prescribed in 8 CFR § 204.5(h)(3)(i)-(x) in order to demonstrate that a noncitizen is classifiable as an individual of extraordinary ability under the EB-1A visa category.  This proposed regulation, had it been promulgated in final form, would have repudiated the Weinig Memorandum.  As noted, the Weinig Memorandum instructed that submission of a minimum of three of the ten categories of qualitatively-acceptable evidence would be "sufficient to establish the caliber of the alien" as an individual of extraordinary ability under the EB-1A visa category, and that there would be "no need for further documentation on [this] question."

34.    In the preface to the June 6, 1995 proposed rule entitled, "Supplementary Information," 60 Fed. Reg. at 29775, INS stated:

> Since the implementation of IMMACT, there has arisen some confusion over the role of various types of evidence listed in 8 CFR 204.5(h)(3). The evidence listed is intended to be a guideline for the petitioner and the [INS] to determine extraordinary ability in order to make the adjudicative process easier for both the petitioner and [INS]. The fact that an alien may meet three of the listed criteria does not necessarily mean that he or she meets the standard of extraordinary ability. The Service adjudicator must still determine whether the alien is one of that small percentage who have risen to the very top of his or her field of endeavor. Accordingly, the Service proposes to amend the regulations to state that meeting three of the evidentiary standards is not dispositive of whether the beneficiary is an alien of extraordinary ability.

35.    The INS June 6, 1995 proposed rule – had it been published in final form and made effective – would have added the following regulatory requirement:

> If the above standards do not readily apply to the beneficiary's occupation, the petitioner may submit comparable evidence to establish the beneficiary's eligibility. **Meeting three of the evidentiary standards listed in [redesignated] paragraph (i)(3) of this section [i.e., paragraph (h)(3) before redesignation] is not dispositive of whether the beneficiary is an alien of extraordinary ability. The petitioner has the burden of proof to establish that he or she is an alien of extraordinary ability**. (Emphasis added.)

36.    Neither INS nor Defendant USCIS ever promulgated a final regulation to require that meeting three of the ten evidentiary standards listed in 8 CFR §204.5(h)(3) would be insufficient to establish that a noncitizen seeking EB-1A visa classification is an individual of extraordinary ability in his or her field of endeavor.

37.    Consequently, the Weinig Memorandum – which determined that submission of at least three categories of qualitatively-acceptable evidence listed in 8 CFR § 204.5(h)(3)(i)-(x) is sufficient to designate the individual as a person of extraordinary ability under the EB-1A visa classification and that no further documentation on that issue would be required – remained the definitive agency interpretation until December 22, 2010 when Defendant USCIS issued a policy memorandum, PM-602-0005.1, "Evaluation of Evidence Submitted with Certain Form I-140

Petitions; Revisions to the Adjudicator's Field Manual (AFM) Chapter 22.2, AFM Update AD11-14" ("PM-602-0005.1"), accessible at: https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/i-140-evidence-pm-6002-005-1.pdf (last visited August 29, 2019).

38.     Defendant USCIS stated in PM-602-0005.1:

[That this policy memorandum **rescinds and supersedes all previously published policy guidance issued by** USCIS **and the legacy Immigration and Naturalization Service (INS) specific to the evaluation of required initial evidence submitted in support of Form 1-140 petitions under Title 8 Code of Federal Regulations (8 CFR) sections 204.5(h)(3) and (4)** . . . (emphasis added; footnote omitted).

39.     Aside from purporting to rescind and supersede the INS Weinig Memorandum, PM-602-0005.1 – a rescission which has never been the subject of APA public notice or opportunity for comment – adopted a "two-part adjudicative approach" based upon a Ninth Circuit Court of Appeals decision, *Kazarian v. USCIS,* 596 F.3d 1115 (9th Cir. 2010), to determine extraordinary ability for purposes of the EB-1A visa category. PM-602-0005.1 has been incorporated into the Defendants' Adjudicator's Field Manual at Chapter 22.2 Employment-based Immigrant Visa Petitions, Subsection (i), accessible at https://www.uscis.gov/ilink/docView/AFM/HTML/AFM/0-0-0-1/0-0-0-6330/0-0-0-6423.html#0-0-0-417 (last visited on August 29, 2019).

40.     The Adjudicator's Field Manual, by its express terms, contains "policy material [that] is binding upon *all* employees of USCIS, unless or until it is specifically superseded by other policy material. . . . [and there] are no exceptions to this rule." USCIS Adjudicator's Field Manual § 3.4(b) (emphasis in original; accessible at https://www.uscis.gov/ilink/docView/AFM/HTML/AFM/0-0-0-1/0-0-0-728/0-0-0-789.html#0-0-0-244 (last visited on August 29, 2019).

41.     Under the two-part adjudicative approach required by PM-602-0005.1, Defendants directed adjudicating officers to evaluate evidence submitted in support of petitions for aliens of extraordinary ability in the following way:

> (1) Determine whether the petitioner or self-petitioner has submitted the required evidence that meets the parameters for each type of evidence listed at 8 CFR 204.5(h)(3); and

> (2) Determine whether the evidence submitted is sufficient to demonstrate that the beneficiary or self-petitioner meets the required high level of expertise for the extraordinary ability immigrant classification during a final merits determination.

42.     In addition, PM-602-0005.1, at p. 3, Defendants purported to adopt this "two-part adjudicative approach to evaluating evidence described in *Kazarian*[,]" in reliance upon the claim that it "simplifies the adjudicative process by eliminating piecemeal consideration of extraordinary ability."

43.     Defendants' justification, however, does not address IMMACT's legislative history of the EB-1A calling for "streamlined" procedures to review the "extensive documentation" which Congress anticipated would be required to qualify as a person of extraordinary ability.  It likewise does not acknowledge IMMACT's legislative history which made clear that "[a]n alien can also qualify on the basis of a career of acclaimed work in the field."  Nor does PM-602-0005.1 explain how opting for a two-step adjudicative procedure is simpler than reviewing in a single-step whether the evidence accompanying the EB-1A petition taken as a whole satisfies at least three of the ten criteria of 8 CFR § 204.5(h)(3)(i)-(x).  PM-602-0005.1 is thus more complicated than the Weinig Memorandum which recognized that these regulations "were designed to provide for easier compliance by the petitioner and easier adjudication by the examiner."

44.     As the "extensive documentation" in the Administrative Record of Proceedings established, and as explained below, Plaintiff's research in fact reflects her sustained national and

international acclaim in brain science and the role that the GluD1 gene plays in brain circuitry and the functioning of the brain, as well as her "career of acclaimed work in the field."

45.     Federal agencies must comply with the APA when crafting and enforcing regulations and legislative rules.  5 U.S.C. § 553.

46.     Courts have authority to review and invalidate final agency actions that are not in accordance with the law, lack substantial evidence, or are arbitrary and capricious.  5 U.S.C. § 706.

47.     In reviewing Federal agency rules and actions, courts first determine if the agency had statutory authorization to create rules that carry the force and effect of law.  *United States v. Mead Corp*., 533 U.S. 218, 226-227 (2001).  Plaintiff acknowledges that Defendant USCIS has statutory authorization to create rules in compliance with the APA that carry the force and effect of law.

48.     Agency rules fall into four categories: interpretive; general statements of policy; agency organization and internal procedure; and, legislative.  5 U.S.C. § 553; *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014).

49.     Agency rules are legislative if "the agency action binds private parties or the agency itself with the 'force of law,'" *GE v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002) (internal quotation marks omitted), and "an agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding . . . or is applied by the agency in a way that indicates it is binding." *Id*. at 383.  A legislative rule "does more than simply clarify or explain a regulatory term, or confirm a regulatory requirement, or maintain a consistent agency policy. . . A rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979); *Mendoza,* 754 F.3d at 1021.

50.     Agency rules based on broad statutory language that create specific responsibilities are legislative rules.  *Mendoza*, 754 F.3d at 1022 (Department of Labor regulations creating evidentiary requirements for U.S. employers were legislative because the broad and general nature of the statutory text anticipated notice and comment rulemaking).

51.     Agency rules that require the regulated community to alter behavior in order to receive a government benefit are legislative and not procedural rules.  *Id.* at 1024 (rule demanding a minimum wage set a mandatory standard for applicants).

52.     Agency rules that bind or create mandatory requirements are legislative rules, requiring notice and comment rulemaking.  *See Elec. Privacy Info. Ctr. v. US Dept. of Homeland Security,* 653 F.3d 1, 6 (D.C. Cir. 2011) (binding and mandatory screening requirements at airports were legislative and not interpretive rules).

53.     USCIS policies denominated as agency policy and incorporated into the Adjudicator's Field Manual constitute legislative rules which are unlawful if not promulgated in compliance with the APA's notice-and-comment requirements.  *See Guilford College et al v. McAleenan et al.*, Case 1:18-cv-00891, 2019 U.S. Dist. LEXIS 74991 (M.D.N.C. May 3, 2019) (USCIS preliminarily enjoined from implementing policy manual changing unlawful presence interpretations for foreign students where change in policy was an unlawful legislative rule under the APA).

54.     Defendant USCIS's interpretation of 8 CFR § 204.5(h) in PM-602-0005.1 is not deserving of judicial deference, and should be rejected as an unlawfully adopted legislative rule in violation of the APA.  Agencies are not automatically afforded judicial deference to interpretations of their own regulations.  So-called *Auer/Seminole Rock* deference to an agency's interpretation of its own regulations will only apply in limited circumstances.  *See Kisor v. Wilkie*, 139 S. Ct. 2400,

204 L. Ed. 2d 841 (2019).  Courts will apply traditional tools of interpretation to determine whether a challenged regulation is genuinely ambiguous, and even then, courts will defer to the agency view only after considering a variety of factors, including whether the agency interpretation (a) is well considered, (b) the interpretation has been consistently maintained, and (c) "creates unfair surprise to regulated parties."  *Kisor*, 139 S. Ct. at  2418.

55.     Defendants' regulations at 8 CFR § 204.5(h) are not ambiguous.  They prescribe that three categories out of a possible ten types of qualitatively-acceptable evidence are sufficient to demonstrate extraordinary ability in a field of endeavor.  Although the regulatory definition of extraordinary ability is incomplete based on the legislative history (omitting Congressional recognition of eligibility "on the basis of a career of acclaimed work in the field"), what remains is clear.  Nothing in the regulations supports the newfound agency inference that requires a final-stage merits determination.

56.     Even if ambiguity were somehow perceived, Defendants' interpretation in PM-602-0005.1 is not well considered; indeed, it is illogical in suggesting that a two-stage adjudicative process, involving two bites at the same apple, is simpler than one that involves a single act of qualitatively considering whether three of ten types of evidence have been submitted.  Moreover, as confirmed by the abrupt about-face from Defendants' original interpretation of extraordinary ability in the INS Weinig Memorandum,  PM-602-0005.1 reflects an inconsistent approach to eligibility and creates unfair surprise to self-petitioners such as Dr. Yadav.

57.     Furthermore, judicial deference is likewise inappropriate in situations where agencies do not explain the statutory basis or rationale for rules and regulations.  *Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117, 2126 (2016) ("When an agency has failed to provide

even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law").

58.     Moreover, when a statute, such as 8 U.S.C. § 1255, confers the discretionary authority to adjust the status of a foreign citizen from a nonimmigrant visa category to that of a lawful permanent resident, and the agency denies the adjustment application perfunctorily, without exercising its discretion, the failure to exercise discretion is itself an arbitrary and capricious abuse of discretion subject to judicial reversal under the APA.

## VIII.   STATEMENT OF CLAIM

59.     On May 31, 2017, Defendant USCIS received Plaintiff's duly executed Form I-140 petition, and Form I-485 application, enclosing the required filing fees in the proper amount together with extensive documentary evidence of eligibility.  The I-140 petition requested that she be recognized as an individual of extraordinary ability in science under the EB-1A visa category whose intention to work in her field of extraordinary ability would substantially benefit the United States prospectively.  The I-485 application requested that she be granted adjustment of status from the nonimmigrant H-1B visa category to that of a lawful U.S. permanent resident.

60.     On April 27, 2018, Defendant USCIS issued a Request for Additional Evidence ("RFE") to which Plaintiff responded with a submission that contained extensive supplemental evidence of her extraordinary ability and accompanying legal argument.

61.     On August 8, 2018, Defendants denied Dr. Yadav's EB-1A visa petition, and on May 7, 2019, they denied her application for adjustment of status based solely upon the denial of her EB-1A visa petition ("Notice of Denial" or "Denial").

62.     Defendants' Denial of the EB-1A visa petition included their acknowledgement that the evidence she submitted satisfied two of the minimum three out of a possible ten categories of evidence listed at 8 CFR § 204.5(h)(3)(i)-(x).  The categories of proven satisfactory evidence

pertained to Plaintiff's authorship of scholarly articles in her field in professional publications, 8 CFR § 204.5(h)(3)(iii), and her participation as a judge of the work of others in the field, 8 CFR § 204.5(h)(3)(iv).

63.     Defendants' Notice of Denial maintained, however, that the evidence she submitted did not establish her original scientific contributions of major significance in the field, 8 CFR § 204.5(h)(3)(v), her performance in a leading or critical role for organizations or establishments that have a distinguished reputation, 8 CFR §  204.5(h)(3)(viii), or any of the other evidentiary categories listed in 8 CFR § 204.5(h)(3)(i)-(x).  Their denial also expressly espoused but declined to apply the purported requirement of a final merits determination, apparently in reliance upon (but without citing) PM-602-0005.1.  Moreover, Defendants' Denial ignored and did not address abundant evidence contained in an extensive business plan which confirmed that she would continue her scientific research in ways that would substantially benefit the United States in the future.

64.     Defendants' Denial of Plaintiff's EB-1A petition, and their later non-discretionary denial of her application for adjustment of status, were not in accordance with relevant law, lacked substantial evidence, and were arbitrary and capricious under the APA, 5 U.S.C. § 706.  Their Denial of her EB-1A visa petition articulated novel and unannounced regulatory requirements that were never the subject of final APA notice-and-comment rulemaking and created "unfair surprise" for Plaintiff.

65.     Defendants' Denial of Plaintiff's EB-1A visa petition reflected an arbitrary and capricious disregard and mischaracterization of evidence that she submitted with her original petition and in the response to the Defendants' RFE.

66.     Defendant USCIS's Notice of Denial determined that the "record is lacking documentation of major utilization, independent discussion in major media or professional journals illustrating the contribution's major significance, or independent documentation that the field has deemed Dr. Yadav's work major in significance." (Notice of Denial, Page 4.)  Despite this assertion, USCIS seemingly overlooked or ignored substantial evidence submitted in both the original petition and the response to its RFE.  Relevant expert opinions from the record include the following statements:

A.     Dr. Daniel T. S. Pak, Professor in the Department of Pharmacology and Physiology at Georgetown University, who describes Dr. Yadav as "an extraordinarily able researcher whose already manifest and manifold contributions to basic scientific research cannot be questioned," writes: "Dr. Yadav was the **first in the world** to discover that the Delta One glutamate receptor, which was previously believed to be a so-called "orphan" receptor with no specific purpose, can play an essential role in treating neuropsychiatric disorders.  **This discovery is a "game-changer"; it is revolutionary.**  Dr. Yadav's research findings brought the global scientific community a new and unique understanding of this receptor and present new and wide-ranging possibilities due to the fact that glutamate receptors play a critical role in the treatment of mental illness, addiction, cardiac failure, autism, schizophrenia, depression, and PTSD in humans **and** in the development of mosquitocides. … Dr. Yadav's discoveries and research on ionotropic glutamate receptors have significantly influenced researchers across the globe, not limited to the labs which have been fortunate enough to see her work directly." (Response to RFE, Exhibit 7.)

B.     Dr. Shashank Dravid, Associate Professor in the Department of Pharmacology at Creighton University, explains: "Until Dr. Yadav delved into the studies of GluD1, its role in brain disease was not well understood.  Dr. Yadav's original research brought to light the functions of GluD1.  The originality of her findings is further reinforced by the fact that her identification of an important function of GluD1, combined with the subsequent successful and significant studies on this receptor, identified D-Cycloserine as a drug to cure and reverse aberrant mental illness symptoms in the GluD1 knock out mouse.  **The findings from her research have moved the field forward.**  Her studies established critical knowledge about the important regulatory role that GluD1 plays in brain circuitry and the normal functioning of the brain.  These findings are of utmost significance, to the delta one research field. . . . Dr. Yadav was the first person in the world to present this novel, original, and path breaking set of results that have made the field move forward." (Response to RFE, Exhibit 10.)

C.     Dr. Dravid continues: "Dr. Yadav's original contributions hold major significance in the scientific community.  It is possible the application of her findings may lead to cures for Alzheimer's, schizophrenia, depression, and even autism.  Her findings

22

are original, and I am of the opinion that her work is of major significance. … **The research that Dr. Yadav conducted in my laboratory was pioneering** … cutting edge and critical." (Response to RFE, Exhibit 10.)

       D.       Dr. Margaret Scofield, Associate Professor Emerita in the Department of Pharmacology at Creighton University, states: "Original basic science research findings of such major significance as Dr. Roopali's (relating to the delta one glutamate receptor) are rare; her findings were original and have broad application for applied researchers. . . . Dr. Yadav has experienced . . . rare success; her original research findings serve as a foundation – a map – for applied researchers to follow." (Response to RFE, Exhibit 9.)

       E.       Dr. Scofield further confirms: "*Dr. Yadav was the first in the world to completely characterize the molecular, electrophysiological and phenotypical aspects of the glutamate delta one receptor. … Because she was first in the world to recognize the critical role of the delta one receptor, it is clear that her work is **original**. …* Dr. Yadav's contributions to the field are also of **_major significance_**. *Her results were unexpected, have broad application, and have forever altered the glutamate field. Dr. Yadav's original research has been cited by leading research groups worldwide as they use her discoveries to further their research*. The fact that well-respected researchers across the globe are leveraging Dr. Yadav's discoveries to further science demonstrates that her work on the delta one receptor holds **major international significance**. (Response to RFE, Exhibit 9.)

       F.       Dr. Kasper Hansen, Assistant Professor in the Department of Biomedical & Pharmaceutical Sciences at the University of Montana, states: "Dr. Yadav is a highly skilled research scientist whose work has been internationally recognized as outstanding and innovative. She has consistently demonstrated her extraordinary abilities in neuroscience, particularly in areas of intense interest, including the ionotropic glutamate delta one receptor. … Dr. Yadav has proven to be an outstanding researcher and has advanced our understanding of the behavioral phenotypes that result from knocking out the glutamate delta-1 receptor gene in mouse models. She published the first electrophysiological characterization of the glutamate delta-1 receptor in *Brain Research,* a prestigious journal. … Dr. Yadav provided the first report in the world characterizing the putative ion channel function of the orphan glutamate delta-1 receptor. … Overall, the complexity and extensiveness of the research Dr. Yadav has conducted is extraordinary." (Response to RFE, Exhibit 11.)

       G.       Dr. Hansen continues: "Reviewing the science that has grown from Dr. Yadav's discoveries helps us to clearly see how Dr. Yadav's basic ("pure" or "fundamental") research is leading to practical, applied outcomes. Her published results and the citations thereto are proof that her research is of major significance, impactful, and original, not only in the United States, but also globally. Dr. Yadav's research discoveries in this field are the first of their kind and have paved the path for scientists across the globe to explore possible treatments for mental illnesses that were previously thought to be untreatable. .... The research findings from Dr. Yadav's studies on delta-1 were recognized as breakthrough research in our field and have served as a basis for further studies on these topi**c**s." (Response to RFE, Exhibit 11.)

H.     Dr. Bertrand Lambolez, Research Director at the National Institute for Health and Medical Research (INSERM) France, offers the following expert opinion: "Dr. Yadav is internationally recognized for her significant original contributions to research on drug discovery and neuropsychiatric disorders.  Her extraordinary electrophysiological research is of international significance. … Dr. Yadav's original landmark findings have suggested substantial implications for the development of therapeutic strategies for neuropsychiatric disorders such as autism and schizophrenia. … Dr. Yadav was the **world's first researcher to characterize the Glutamate delta 1 knock out mouse**. … Dr. Yadav was the **first scientist to publish the research finding that the glutamate delta-1 receptor is strongly associated with neuropsychiatric disorders such as schizophrenia, bipolar disorder, autism spectrum disorders, and major depressive disorder.** [] Dr. Yadav's unique findings have paved the way for scientists across the globe to research practical clinical applications targeting the delta-1."  (Response to RFE, Exhibit 14.)

I.     Dr. Lambolez further confirms: "**This is to emphasize that Dr. Yadav's discoveries are of major significance, even if their full effects have not yet been realized.  With her single revolutionary discovery, she has advanced science in a number of life-changing areas, giving hope to the previously hopeless for a possible cure**. …Very few of today's researchers possess a background as Dr.Yadav possesses. Given her cross-disciplinary focus, **Dr. Yadav is regarded as justifiably standing among the world's most advanced and original researchers** in the Glutamate delta 1 receptor. Her research **leads the way** in suggesting the discovery of innovative treatments for neuropsychiatric disorders and the development of novel mosquitocides in which the glutamate delta one receptor is involved.."  (Response to RFE, Exhibit 14.)

J.     Dr. Zhengyu Cao, Professor and Vice Chair of the Department of Complex Traditional Chinese Medicine at China Pharmaceutical University, confirms: "Dr. Yadav has armed the glutamate receptor field with an original, novel, important, and unexpected set of results that have dramatically changed our understanding of the ionotropic glutamate delta one receptor. … her work is of worldwide importance and has advanced science extraordinarily in this research area."  (Response to RFE, Exhibit 13.)

K.     Dr. Cao further confirms: "[H]er work in characterizing the structure and function of the glutamate delta one receptor was groundbreaking.  Dr. Yadav showed through her original research the structural properties of the delta one receptor; she discovered an agonist that activated the (until them orphan) delta one receptor.  __These discoveries are original works of science and of utmost significance in the scientific field.  Dr. Yadav's discovery of D-Serine as the agonist for delta one holds tremendous significance; leveraging Dr. Yadav's findings, the glutamate field has been enabled to move forward at rapid speed__. . . . __Based on Dr. Yadav's research, D-cycloserine is in clinical trials for post-traumatic stress disorder.__"  (Response to RFE, Exhibit 13.)

67.     Defendant USCIS's Notice of Denial acknowledged that Dr. Yadav's publications are "highly cited for their years" but states that petitioner failed to "demonstrate how these numbers

are indicative of contributions of major significance in the field." The agency observes that "[t]he evidence also includes journal metrics" but states that it "will not presume that every article that appears in a well-ranked journal has major significance." Defendant USCIS further noted that "[a]rticles that cited the petitioner's work were presented, as well as a list of her articles and their citations from Google Scholar. Her publications had garnered approximately 170 citations when the petition was filed. However, while some are highly cited for their years, the data do not demonstrate how these numbers are indicative of contributions of major significance in the field." (Notice of Denial, Page 4.)

68.     Defendants again overlook the evidence presented. Dr. Yadav's publications, given the rankings of the journals and the citations to her work, clearly demonstrate that Dr. Yadav's work is of "major significance." Relevant expert opinions from the record follow:

A.     At the time that Plaintiff responded to USCIS's RFE, the count of citations of Dr. Yadav's work had climbed to 207. (Response to RFE, Exhibit 5.)

B.     The citations themselves demonstrate recognition of Dr. Yadav's work and serve as proof that her contributions are of major significance. Dr. Scofield explains the importance of Dr. Yadav's citation history:

The government's request also indicates that Dr. Yadav's citation level does not illustrate that her work has been considered of major significance. Again, this statement surprises me, as Dr. Yadav's citation history is enviable. Dr. Yadav's work has been cited 207 times (181 times since 2013). As noted in the attached Google Scholar profile and journal metrics, her work has been published in high-ranking journals and has been cited an extraordinary number of times. (Response to RFE, Exhibit 9.)

C.     Dr. Scofield also explains why the citations are indicative of contributions of major significance in the field by comparing the citations garnered by Dr. Yadav's publications compare to the citations that other articles in the same journals have received:

Dr. Yadav's 2010 article in the *Journal of Neuroscience* has been cited 82 times. As noted in the attached journal metrics, articles published in this journal in 2010 have been cited, on average 8.12 times. Dr. Yadav's article has been cited more than eight times as often as the average *Journal of Neuroscience* article. This is particularly notable given that the Journal of Neuroscience ranks as the #11 (of 154) neuroscience journal in the world." Dr. Scofield also affirms that Dr. Yadav's

article in *PloS one* (2012) has been cited 60 times (12 times as often as the average *PloS one* article); her article in *PloS one* (2013) has been cited 27 times (6 times as often as the average *PloS one* article); and her *Brain Research* article has been cited 13 times (more than 4 times as often as the average *Brain Research* article. (Response to RFE, Exhibit 9.)

D.      Dr. Dustin J. Stairs, Professor in the Department of Psychological Science at Creighton University comments upon Defendants' statement that "… we cannot determine that the citations illustrate more than the mere iterative nature of scientific research." He writes:

> This to me indicates the officer may lack a fundamental understanding of how the scientific field works. Citations of our work is not "mere iterative", as a scientist you only cite work that you have read and influenced your thinking you don't randomly cite papers just because or for repetition purposes. When we write a paper, it is not appropriate to go into detail about the great work Dr. Yadav does and how it influenced your thoughts and experiments, you give them credit by citing their work, that is what we do.  []If U.S. Citizenship and Immigration Services is expecting to see grandiose statements in papers about the work of any scientist and how meaningful they are, then the agency is tilting at windmills. (Response to RFE, Exhibit 8.)

E.      Dr. Zhengyu Cao, Professor and Vice Chair of the Department of Complex Traditional Chinese Medicine at China Pharmaceutical University, writes:

> Dr. Yadav is **well-known and well-respected globally as a top researcher in the neuroscience field, particularly with regards to the ionotropic glutamate delta one receptor**. … **Dr. Yadav's work was cited in the world's most cited scientific journal, *Nature***.  A research group built its research findings on Dr. Yadav's original findings, resulting in additional avenues for the treatment of Autism. … These citations demonstrate **Dr. Yadav's international acclaim and the major significance of her extraordinary and original findings, which continue to advance science and lead to therapies for mental disorders that were previously believed untreatable**.  (Response to RFE, Exhibit 13.)

F.      Dr. Kasper Hansen, Assistant Professor in the Department of Biomedical & Pharmaceutical Sciences at the University of Montana, provided a letter attesting to a number of significant outcomes from Dr. Yadav's work, listing key groups that have cited Dr. Yadav:

> The results from her research have aided the research community by providing invaluable tools that are being employed by numerous top researchers, as evidenced by the fact that they are citing her work and using her original and significant findings to build their own research. This is evident from the numerous citations she holds in top-tier, peer-reviewed research journals." He provides a number of examples: "Dr. Yadav's original research has been cited in book chapters, in reviews, as well as in prominent research papers.  In their book chapter, Wataru

Kakegawa and Michisuke Yuzaki … rely on Dr. Yadav's research to further advance the delta-1 research field. … Leading research groups based in Europe collaborated on a project and cited Dr. Yadav's research in *Molecular Psychiatry*.  Different research teams coming together and citing a particular scientist's work is rare; typically, labs work independently.  The fact that these well-known groups cited Dr. Yadav's research has helped to establish Dr. Yadav's reputation as a top researcher internationally..."  (Response to RFE, Exhibit 11.)

G.      Dr. Hansen further confirms that:

[Dr. Yadav's] research has been leveraged by top researchers across the globe," including Aki Takahashi and Klaus A. Miczek in *Neuroscience of Aggression* and researchers from the prestigious Danders Institute for Brain, Cognition and Behaviour in *Molecular Psychiatry*, "with an impact factor of 13.204 (ranked 4th among 142 journals in the field of Psychiatry)."  (Response to RFE, Exhibit 11.)

H.      Dr. Hansen explains Dr. Yadav's citations and the importance they hold, particularly in her field:

Her findings have been cited and used by top researchers worldwide to guide their own research.  This is exemplified by her work being cited in the topmost tier scientific journal *Nature*.  This speaks of the originality of Dr. Yadav's research and its major significance in the research field.  Further, the very fact that Dr. Yadav's research has been cited by a leading research group who published in *Nature* and conduct research at Ivy League research institutes such as Harvard Medical School at Boston, Beth Israel Deaconess Medical Center at Boston Hospital Intellectual, and Development Disabilities Research Center establishes her as an internationally renowned scientist of the highest caliber.  (Response to RFE, Exhibit 11.)

I.      Finally, Dr. Hansen describes the importance of the speed at which Dr. Yadav's work has been recognized:

Moreover, the rate at which Dr. Yadav's citations of her work have been growing is rapid indicative of the fact that Dr. Yadav's research is of major significance.  In the past 10 months, Dr. Yadav's work has been cited in 32 journals.  This speaks very highly of the reputation of the research that Dr. Yadav has conducted.  I want to emphasize that the number of citations a publication will garner is dependent on the area of research.  The field of glutamate delta receptors is narrow; there are only a handful of dedicated experts in this field.  Thus, to attract even a few citations in this area is impressive (whereas, in a broad field such as cancer research, one might only be impressed by hundreds of citations).  The rate at which Dr. Yadav's citation numbers are growing is an indicator of the major significance of her research.  Specifically in the glutamate delta receptor field, gaining 32 citations in 10 months is remarkable."  (Response to RFE, Exhibit 11.)

J.      Dr. Bertrand Lambolez, Research Director at the National Institute for Health and Medical Research (INSERM) France, states:

> I cited Dr. Yadav's original research results of major significance in my published research in highly prestigious research journals which accept only the top most original research.  Attesting to the significance of her scientific findings, I cited three of her publications in one of my own published articles. … The fact that Dr. Yadav's research findings are of major significance to the worldwide research community is demonstrated by the fact that her findings have been cited time and again by leading research groups (including mine); her work has been cited in prestigious research journals such as *Nature, Nature Neuroscience, Molecular Psychiatry,* and *PNAS* to name a few.  (Response to RFE, Exhibit 14.)

K.      Dr. Shashank Dravid, Associate Professor in the Department of Pharmacology at Creighton University, outlines a selection of research that scientists have accomplished by building upon Dr. Yadav's findings, including his own work, published in his book chapter in *Neuroscience and Biobehavioral Psychology*; scientists at the MIND Institute at the University of California Davis; scientists who cited Dr. Yadav in *Nature Neuroscience;* "Dr. Donald Goff, an internationally reputed clinician researcher"; "Yuzaki and Arisceu, in their 2017 journal publication in *Trends in Neurosciences* (a prestigious journal with an impact factor of 17.755)"; the "prestigious research group (Benamer et al.), in their extraordinary 2018 publication in *Molecular Psychiatry* (impact factor: 13.2014)", who "cite three of Dr. Yadav's research papers in their study of large scale brain circuit dysfunctions"; Dr. Zhou's team in *Progress in Neuro-Psychopharmacology and Biological Psychiatry;* and scientists that published in "*Nature,* the most prestigious scientific journal in the world, with one of the highest impact factors of 40.137."  (Response to RFE, Exhibit 10.)

69.     Defendant USCIS's Notice of Denial USCIS determined that the Plaintiff "failed to establish eligibility" through evidence "that the alien has performed in a leading or critical role for organizations or establishments that have a distinguished reputation."  (Notice of Denial, pp. 3-4.) Defendant USCIS further claimed that "[t]he evidence does not establish that the petitioner held a leading role for these labs or organizations, nor does it establish that her role as a student, post-doctoral research associate or researcher was leading or critical for a distinguished establishment or organization as a whole."  (Notice of Denial, p. 5.)

70.     Defendant USCIS disregards letters submitted by Dr. Yadav from writers who did not employ her (such as the letters from Dr. Elbadry and Dr. Scofield), stating "employment letters must come from employers" (regarding Dr. Elbadry's letter) and "the letter was not from an

employer (in regards to the letter from Dr. Scofield).  In opting not to consider these letters as evidence, USCIS cites a general regulation governing all employment-based immigrant visa categories, 8 CFR § 204.5(g)(1), describing letters attesting to qualifying experience or training which must "be in the form of letter(s) from current or former employer(s)."  (Notice of Denial, Page 5.)

71.     Defendant USCIS has failed to acknowledge, however, that the letters were not submitted as evidence of experience or training but rather as evidence of Dr. Yadav's critical role for organizations with distinguished reputations.  Moreover, even for a petitioner seeking to prove that the noncitizen in question possesses the required training or experience to qualify for the job, the regulation states that if "such evidence is unavailable, other documentation relating to the alien's experience or training will be considered."  8 CFR § 204.5(g)(1).

72.     If Defendant USCIS had correctly interpreted the regulations, it would have found that 8 CFR § 204.5(h)(3) speaks to acceptable evidence for petitions for classification as an alien of extraordinary ability and places no limitation on the types of evidence that might be acceptable to prove that the alien "had performed in a leading or critical role for organizations or establishments that have a distinguished reputation."

73.     USCIS articulated no legitimate basis to disregard the letters from Dr. Elbadry and Dr. Scofield or from any of the other experts whose letters attested to Dr. Yadav's extraordinary ability as a GluD1 gene research scientist.  *See Matter of Skirball Cultural Center*, 25 I&N Dec. 799, 805-806 (AAO 2012) (where USCIS adjudicator did not question the credentials of the experts, take issue with their knowledge of the [beneficiary], or otherwise find reason to doubt the veracity of their testimony, such uncontroverted testimony was held to be reliable, relevant, and probative as to the specific facts in issue).

74.     The Notice of Denial states:

"The letter from Dr. Scofield, Associate Professor at Creighton University School of Medicine, states that Dr. Yadav's work at the Emerging Pathogens Institute at the University of Florida as a researcher proved critical in advancing science relating to mosquitocides and she left a lasting legacy at EPI and her research.  It allowed EPI to carry out work funded by the Gates Foundation Grant and advanced science relating to two of the 14 listed research areas in EPI's brochure.  It is noted that Dr. Scofield's C.V. numbers the petitioner among tens of student and committee advisees.  The letter did not distinguish her work from the many scientists who also worked on the two of the 14 research areas listed in EPI's brochure in a manner to evidence a critical role.  The letter also was not from an employer."  (Notice of Denial, Page 5.)

75.     As explained above, this letter should not have been disregarded notwithstanding that its author has not been Dr. Yadav's employer.  Further, the letter, contrary to Defendant USCIS's contention, uses phrases of comparative analysis throughout:

Dr. Yadav has risen to the very top of her field and has received international acclaim for her groundbreaking glutamate work. … Her research work rivals that of the top scientists in the U.S. and in the world.  Dr. Yadav belongs to that elite group of researchers whom we should strive to retain in our nation. … on a research project on the ionotropic glutamate delta one receptor; she was the leading scientist on the project.  (Response to RFE, Exhibit 9.)

76.     Dr. Scofield continues by providing evidence of Dr. Yadav's critical role at EPI and of EPI's reputation:

The world'[s] top researchers converge to conduct research at EPI.  It is clearly an organization with a distinguished reputation.  Thus, it is not surprising that Dr. Yadav was selected for a postdoctoral position here based on her merit and reputation as an extraordinary researcher.  Her role at EPI proved critical in advancing science relating to mosquitocides, and she left a lasting legacy at EPI. … Her role at EPI was critical, as it allowed EPI to carry out the work for which it received the Gates Foundation Grant, the first such grant awarded to the University of Florida.  She also provided critical research advancing science relating to two of the 14 listed research areas in EPI's … brochure (malaria and Zika).  (Response to RFE, Exhibit 9.)

77.     Dr. Scofield further describes Dr. Yadav's critical role at Georgetown, highlighting its distinguished reputation:

Georgetown University is one of the world's leading academic and research institutions, and the paklab where Dr. Yadav works is known nationally and internationally as the

leading lab in the world conducting research on synaptic plasticity and Alzheimer's disease.  Dr. Yadav serves as a team leader, a critical leadership role in the paklab, where she trains researchers and is responsible for securing continued funding for the lab (to the tune of nearly $2 million) (Response to RFE, Exhibit 9.)

78.     As noted above, USCIS incorrectly disregarded altogether the letter from Dr. Maha Elbadry, Researcher and Scientist at the Emerging Pathogens Institute (EPI) because of its author's status as a colleague, rather than an employer, of Dr. Yadav.  This letter describes the distinguished reputation of the EPI and Dr. Yadav's critical role within the organization:

> The Emerging Pathogens Institute is a leading interdisciplinary research institute that enjoys well-earned world prominence.  The top and best researchers from across the globe converge here to conduct research.  Dr. Yadav, based on her extraordinary research accomplishments, was invited to conduct research here.  The Emerging Pathogens Institute is known internationally for its interdisciplinary research, including Dr. Yadav's research on mosquitoes and mosquitocide development. … The EPI was created to study emerging and re-emerging pathogens considered a threat to the State of Florida.  The concept quickly garnered university support, and funding from the State of Florida Legislature, which appropriated $55 million to construct the EPI Building.  Currently, EPI has over 200 affiliated faculty members, from 10 colleges, who are Institute members; collaborative research activities are underway in 34 countries.  All these accomplishments prove that the Emerging Pathogens institute is a distinguished organization affiliated with a distinguished university. … The University of Florida, of which the EPI is a part, is one of sixty-two elected member institutions of the Association of American Universities (AAU), the association of preeminent North American research universities.  For 2018, U.S. News & World Report ranked Florida as the ninth (tied) best public university in the United States.
>
> . . .
>
> Her role at the EPI was essential and critical to the organization's research as a whole, as she moved research forward, giving the entire organization a new focus and renewed hope.  Her research prowess in both mosquito and human glutamate receptors was a major, game-changing contribution that has proven instrumental to the success of the research program here at the EPI. … Mosquito tolerance to mosquitocides is a grave problem, and Dr. Yadav's research in this area has provided the EPI the foundation and tools needed to cure for this evergreen problem of mosquito resistance.  Her extraordinary and unique work is leveraged by researchers at the EPI on a daily basis. … Dr. Yadav played a critical role at the EPI; the extraordinary, novel, and pioneering research she conducted were pivotal. (Response to RFE, Exhibit 15.)

79. Defendant USCIS's Notice of Denial in its description of the letter from Dr. Daniel

T. S. Pak, Professor in the Department of Pharmacology and Physiology at Georgetown

University, mischaracterizes Dr. Pak's expert opinion:

> The petitioner provided a letter from her supervisor, Dr. Pak at Georgetown University Medical Center. He states that Dr. Yadav is among a pool of researchers that helps the organization receive grant funding. However, the letter does not distinguish the critical nature of her role compared to others at Georgetown University Medical Center in a manner that illustrates that she holds a leading or critical role for more than a department or component within the Center. The petitioner provided an Alzheimer's document and an NIH budget proposal but did not provide independent documentation that identified Dr. Pak's lab as an organization or establishment with a distinguished reputation. (Notice of Denial, Pages 4-5.)

80. Notwithstanding Defendant USCIS's assessment, Dr. Pak's letter provides

evidence that Dr. Yadav holds a critical role in his lab:

> Dr. Yadav plays a critical role in advancing our understanding of possible treatments for Alzheimer's disease in mice models. Her role is of utmost importance and is critical to the success of my lab's research projects. … Dr. Yadav plays a critical leadership role in my lab's Alzheimer's research. … A team of Ph.D. students work under the leadership of Dr. Yadav. She trains them and provides research guidance. In addition, she plays a critical role in imparting research training and direction to undergraduates in my lab. Dr. Yadav collaborates with and trains other post-docs in my laboratory on unique research techniques relating to glutamate receptors; drafts grant submissions relating to glucose metabolism and associated techniques; and provides overall guidance and leadership to the lab (including to me) related to research on the coordinated regulation of neuronal activity with metabolism or energy availability. For grant applications, Dr. Yadav will be critical to the lab's ability to continue in its Alzheimer's research, as we will be applying techniques on which Dr. Yadav is an expert. … Dr. Yadav's role is critical to the functioning of my laboratory, the success of my students, and our ability to obtain future research funding." (Response to RFE, Exhibit 7.) Dr. Pak also provided evidence of the distinguished reputation of his lab: "My lab, the "paklab," at Georgetown focuses on experience-dependent remodeling of the brain. As noted above, my lab has been awarded a number of prestigious grants from the NIH and the Bright Focus Foundation. The paklab is known nationally and internationally as the leading lab conducting research on synaptic plasticity and Alzheimer's disease. … The paklab has won numerous awards and fellowships, including the AAAS Science and Technology Policy Fellowship, National Institutes of Health National Research Service Award, Rotary Club Fellowship, Georgetown Undergraduate Research opportunities Program (GUROP) Summer Research Fellowship, and the Harold N. Glassman Award for Most Meritorious Dissertation in the Sciences. The paklab has been funded with NIH ROls, R03s and R56 awards and other prestigious grants from private foundations. ... To have a well-funded lab in this climate speaks to the success and reputation of the paklab and its research. (Response to RFE, Exhibit 7.)

81.     In addition to Dr. Pak's own letter and supporting evidence, Dr. Hansen provides

significant evidence of the reputation of the Paklab and of Dr. Yadav's critical role:

> I was surprised to read that USCIS questioned Dr. Yadav's service in critical roles for
> organizations with distinguished reputations.   USCIS suggests that Dr. Yadav must
> demonstrate that she led the University of Nebraska or Creighton University as a whole to
> satisfy the requirement.  For most researchers, becoming the President of a university is an
> unreasonable goal.  It seems more reasonable to focus on Dr. Yadav's critical roles in the
> labs she has worked in.  Those labs have distinguished reputations in the scientific field,
> and her role at each has been critical.  She has trained to younger researchers and has been
> instrumental in obtaining millions in funding for her labs.  She recently joined the
> laboratory of Daniel Tae Sun Pak (paklab) at Georgetown University, which has one of the
> best reputations in the world for Alzheimer's research. … Dr. Yadav is a postdoc in the
> paklab, where she holds a pivotal and leading role, which is critical to its functioning.
> (Response to RFE, Exhibit 11.)

82.     Dr. Hansen also speaks to Dr. Yadav's other critical roles:

> "Dr. Yadav also held critical roles at Creighton University, the University of Nebraska,
> and at the Emerging Pathogens Institute at the University of Florida.  In all three cases, her
> role was critical to the success of the lab and its continued receipt of funding.  In all three
> cases, she left a lasting mark and has a continuing impact on the work being conducted.
> Dr. Yadav has a history of holding critical roles at distinguished organizations.  No scientist
> would ever argue to the contrary.  (Response to RFE, Exhibit 11.)

83.     The Notice of Denial further errs in its characterization of the letter from Dr.

Shashank Dravid:

> The petitioner submitted a letter from Shashank Dravid who stated that Dr. Yadav worked
> in his lab prior to completing her PhD then returned from 2014 to 2016 to complete post-
> doctoral research.  Dr. David states that she was a prolific researcher conducting "pure"
> scientific research in his lab during that time.  The petitioner provided a letter and grant
> detail describing the grants on which Dr. Yadav contributed.  It is also evident that other
> researchers contributed with Dr. Yadav at Dr. Dravid's lab.  The documentation does not
> distinguish the extent of her contributions during her student years or post-doctoral years
> when compared to other researchers at the lab, or with Dr. Yadav [sic] himself to credit her
> with a leading role within the lab, or a critical role consistent with this regulatory criterion.
> (Notice of Denial, Page 5.)

84.     Dr. Shashank Dravid, Associate Professor in the Department of Pharmacology at

Creighton University describes his lab's distinguished reputation, which USCIS does not dispute.

As to Dr. Yadav's critical role, Dr. Dravid explains:

My research has been funded by leading research grant agencies such as the National Institutes of Health (NIH), the National Alliance for Research on Schizophrenia and Depression, the National Science Foundation (NSF), Nebraska EPSCoR, the Dr. George F. Haddix President Faculty Research Fund (Creighton University), and the Nebraska LB692 Faculty Development Award. … Dr. Yadav played a pivotal role in the research, experimentation, data submission, and the writing and review of the aforementioned grant applications. Dr. Yadav contributed enormously to the success of these projects, and without her critical contributions we may not have seen the successful completion of the projects. Dr. Yadav played a critical role in helping my laboratory secure this funding through the award of these grants to me and my laboratory. As we were a startup lab, these grants were critical to the operation of the lab, allowing us to further investigate the delta one receptor, to establish the lab's authority in the glutamate delta one receptor field, and to publish prolifically in highly respected journals on this research topic. … In recent years, funding for scientific research has been extremely difficult to procure. My laboratory was able to remain funded in this difficult environment, and Dr. Yadav's extraordinary research played an important part for this. (Response to RFE, Exhibit 10.)

85.     Finally, the Notice of Denial reflects that Defendants discounted a letter from Dr. Paras Mishra, arguing that the letter does not compare Dr. Yadav's work to "all of the other researchers or research projects conducted by the lab." (Notice of Denial, Page 5.) However, the nature of Dr. Mishra's letter is, necessarily, a comparison of Dr. Yadav with other scientists in Dr. Mishra's lab and in the scientific community. The letter uses phrases of comparative analysis throughout:

Dr. Yadav is a *global expert* in the area of glutamate receptors. … Dr. Yadav held a *critical role* in the Mishra lab. … Her role was *critical* to the Mishra lab and the Cellular and Integrative Physiology Department as a whole, as her *exceptional expertise* in the brain and glutamate receptors brought a new perspective to our diabetes research. … Dr. Yadav's *extraordinary research* focus in this area was *critical* to the studies we conducted in my lab. … This was something that *only Dr. Yadav had the capacity to do*. These studies were *critical*, and the data resulting from these studies would prove of *tremendous importance* to advance scientific knowledge. … Dr. Yadav, with her expertise and extraordinary background, was *uniquely qualified* to cover such studies. (Response to RFE, Exhibit 12, emphasis added.)

86.     As demonstrated above, Defendants have committed multiple errors of law and repeatedly disregarded, misinterpreted or mischaracterized relevant and probative evidence to deny Plaintiff's petition seeking classification as an individual of extraordinary ability in science. Rather than considering Plaintiff's evidence as a whole to determine whether she had made

original scientific contributions of major significance in her field, Defendants' "review excessively focused on the significance of individual components of the submission." *Chursov v. Miller*, No. 18-CV-2886 (PKC), 2019 WL 2085199 (S.D.N.Y. May 13, 2019) (failure to adequately consider the totality of the evidence of EB-1A extraordinary ability was arbitrary and capricious).

87.     In addition, Defendants have engaged in an arbitrary and capricious adjudication of Plaintiff's EB-1A visa petition by (a) adopting as a legislative rule and applying to Plaintiff the purported obligation to conduct a final merits determination (despite their failure to comply with the notice-and-comment rulemaking requirements of the APA), and then (b) declining to make a final merits determination because in Defendant's erroneous view only satisfied two but not at least three of the relevant evidentiary criteria listed at 8 CFR § 204.5(h)(3)(i)-(x).

88.     Under 5 U.S.C. §§ 702 and 704, Plaintiff has suffered a "legal wrong" and has been "adversely affected or aggrieved" by agency action for which there is no other adequate remedy of law.

89.     Plaintiff has been denied the right to a lawful decision on her EB-1A visa petition and her application for adjustment of status to that of a lawful permanent resident (a status that would make her eligible for several research grants which require permanent residency as a precondition to a grant award), and she has been denied the ability to continue her research studies and her employment as a research scientist beyond an aggregate period of six years under 8 U.S.C. 1184(g)(4), which requires an approved or pending immigrant visa petition.

## COUNT ONE

## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 701, ET SEQ.,  THE IMMIGRATION AND NATIONALITY ACT AND ITS IMPLEMENTING REGULATIONS – DENIAL OF EB-1A VISA PETITION

90.     Plaintiff re-alleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1-89 above.

91.     Plaintiff is entitled to review by this Court pursuant to 5 U.S.C. §§ 701-706.

92.     A reviewing court shall "hold unlawful and set aside agency action . . . found to be—arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

93.     Defendants denied Plaintiff 's EB-1A Visa Petition grounds that are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law in holding that the evidence in the record was insufficient to establish that she is a research scientist of extraordinary ability in her field of endeavor, namely, the molecular characterization of the glutamate delta one receptor ("GluD1") and its role in brain disease who seeks to enter the United States to continue work in her area of extraordinary ability, and whose entry into the United States will substantially benefit prospectively the United States.   Plaintiff submitted more than sufficient evidence demonstrating that she satisfied the statutory requirements for classification as a priority worker under 8 U.S.C. § 1153(b)(1).

94.     Defendants failed to properly consider all record evidence and failed to determine as required by the INA whether Dr. Yadav was a research scientist of extraordinary ability who would continue her work in the future once accorded lawful permanent resident status in ways that would substantially benefit the United States.

95.     In addition, Defendants reached factual conclusions as to relevant regulatory criteria unsupported by any evidence in the record; misconstrued the applicable regulations; impermissibly imposed evidentiary requirements beyond those required by Congress; and erroneously concluded that Plaintiff had not demonstrated that her EB-1A petition and supporting evidence qualified her for approval as a research scientist of extraordinary ability.

59030006v.2

96.     Defendants' errors, singly and in combination, were arbitrary, capricious and in violation of the law.  Consequently, Defendants acted arbitrarily, capriciously, and unlawfully in violation of the APA, the INA, and the immigration regulations by denying Plaintiff's EB-1A Visa Petition.

## COUNT TWO

## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 701, ET SEQ., THE IMMIGRATION AND NATIONALITY ACT AND ITS IMPLEMENTING REGULATIONS – DENIAL OF APPLICATION FOR ADJUSTMENT OF STATUS

97.     Plaintiff re-alleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1-96 above.

98.     Defendants' actions were arbitrary, capricious, an abuse of discretion and otherwise in violation of the law, and therefore contrary to the APA, in failing to exercise discretion in the adjudication of her adjustment of status application and denying it solely based on their unlawful denial of her EB-1A Visa Petition.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

1.      Declare that Defendants' determination that Plaintiff had not established in her EB-1A petition her qualifications as a research scientist of extraordinary ability was arbitrary and capricious and not in accordance with law in violation of the APA, 5 U.S.C. § 706(2)(A), the INA and the Defendants' own regulations;

2.      Declare that the requirement of a final merits determination in PM-602-0005.1 to the extent Defendants claimed that such a requirement applied to Plaintiff was *ultra vires* and inconsistent with Defendant USCIS's regulations, was arbitrary and capricious and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A), and the INA;

3.     Declare that sufficient evidence exists in the administrative record establishing that Dr. Yadav is a research scientist of extraordinary ability, that upon the adjustment of her status to lawful permanent resident, she intends to continue to demonstrate extraordinary ability in pursuing her area of scientific research, and that her prospective research contributions will substantially benefit the United States.

4.     Vacate the denial of Plaintiff's EB-1A petition and remand this matter to Defendants with instructions that, within ten days of the date of the Court's Order, they approve the Form 1-140, Immigration Petition for Alien Worker, previously filed by Plaintiff on May 31, 2017 and accord the petition its original date of filing as the immigrant visa priority date;

5.     Vacate the denial of Plaintiff's adjustment of status application and remand this matter to Defendants with instructions that, within ten days of the date of the Court's Order, they reinstate and continue to process in the ordinary course her Form 1-485, Application to Register Permanent Residence or Adjust Status, previously filed by Plaintiff pending the availability of an immigrant visa;

6.     Award reasonable attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d), 5 U.S.C. § 504, or any other applicable law; and

7.     Grant such other relief as the Court deems just, equitable and proper.

DATED:  September 12, 2019          Respectfully submitted,

         SEYFARTH SHAW LLP


By:*/s/ Samantha L. Brooks*

         Samantha L. Brooks (DC Bar No. 1033641)
         Angelo A. Paparelli (to be admitted *pro hac vice*)
         SEYFARTH SHAW LLP
         975 F St. NW
         Washington, DC 20004
         Telephone:  (202) 828-3560
         Facsimile:   (202) 641-9209
         sbrooks@seyfarth.com apaparelli@seyfarth.com

         Nicole A. Kersey (to be admitted *pro hac vice*)
         BOSE MCKINNEY & EVANS LLP
         111 Monument Circle, Suite 2700
         Indianapolis, IN  46204
         Telephone:  (317) 684-5196
         Facsimile:   (317) 223-0196
         nkersey@boselaw.com

         *Attorneys for Plaintiff*

59030006v.2